## [No. 3645.] ·

### George West v. The State.

1. EVIDENCE — PROOF OF THE GENERAL CHARACTER.— It is a general rule of evidence in this State that, in prosecutions for murder or assault to commit murder, threats made by the deceased, or the assaulted party, and the dangerous character of the deceased or assaulted party, are only admissible when it is shown that, at the time of the homicide or the assault, the injured party did some act indicating his purpose then to take the life of the defendant or do him some serious bodily harm; or when the circumstances of the case raise a doubt in regard to the question whether the accused committed the homicide or assault in self-defense. See the opinion *in extenso*, and the statement of the case, for facts *held* sufficient, under this rule, to entitle the defendant, in a prosecution for assault with intent to murder, to prove the general dangerous character of the party assaulted.

2. SELF-DEFENSE — CHARGE OF THE COURT.— Note also proof which entitled the defendant to a correct charge upon the subject of self-defense, and see the opinion for a special charge upon the subject which, in view of the evidence, was erroneously refused.

3. SAME.— See the statement of the case for a charge of the court *held* erroneous because calculated to mislead the jury in its consideration of an important matter of defense.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The conviction in this case was for an assault with intent to murder one Al. Rainey, in Travis county, Texas, on the 4th day of November, 1884. The penalty assessed by the jury was a term of two years in the penitentiary.

Al. Rainey was the first witness for the State. He testified that for the past twenty-five years he had lived at Manor, in Travis county, Texas. He knew the defendant, who for the last three or four years had lived within three or four miles of Manor. Witness was at the town of Manor on the 4th day of November, 1884, the day of the last national election. The defendant was there during the whole of that day, but the witness did not speak to him. Just before night the witness was told by some one that the defendant had gone or was going for a gun, and he saw the defendant in Manor on that evening with a gun. Witness saw him that night at the house of Hilario, a Mexican. The house of the said Hilario was then full of people engaged in gambling with cards. That house was some three or four hundred yards from the town of Manor. Witness went into this house and soon became engaged in a game,— dealing the game of *monte*. Within a few minutes the defendant came into the house and began playing at the game which the witness was then dealing. Defendant had played but a short time when he began a quarrel with the witness. Witness then threw at the defendant some money the latter had dropped, and both got up from their seats, when the witness struck and kicked the defendant, and got a bench to hit him with. The defendant then ran out of the house, and the witness followed him. Several persons then told witness that the defendant had gone to the house of Jim Houghton, which was about a quarter of a mile distant from Hilario's house, in a southeast direction.

The defendant having gone, as the witness was informed, to the house of Jim Houghton, the witness went back into Hilario's house, and took a seat on the side of a bed, where he remained some ten or twenty minutes. He then got up, got his pistol, and told those

present that he was going to the house of Jerry Parsons to go to bed. Jerry Parsons lived a little east of north from Hilario's house, and about sixty yards distant from the same, and rather between it and Manor. When the witness arrived at Jerry Parsons's house, he found that none of Parsons's folks were at home, and concluded to go on to Manor, where the judges of election were engaged in counting the vote. Witness had no expectation of encountering the defendant, as he had been informed that the defendant had taken another route. When the witness arrived at a point near the railroad depot he saw two men near and rather behind a box car. Witness at that time had nothing in his hands but a cigar. Just as the witness reached the railroad platform he heard one of the two men behind the box car speak to the other. Soon after this, the defendant threw his gun down on the witness and called out: "Hold up, or I will kill you." The muzzle of the gun was very near the face of the witness. Witness threw up his left hand, and, stooping over, caught his pistol with his right hand. Defendant fired immediately, shooting the witness through the hand and shoulder, and powder-burning his face. Witness here exhibited the bullet holes through his vest and coat. As soon as he fired the defendant ran.

Witness had nothing in his hand at the time he was shot, and up to that time had made no effort to get his hands on his pistol. He had made no demonstrations of a hostile character. Witness did not recognize the defendant until the defendant called to him to stop, and had no expectation of meeting him, as he had been told that the defendant had gone to Jim Houghton's house, which was in another direction. Both witness and defendant were on the railroad platform at the time of the shooting. After he was shot, witness drew his pistol and fired three shots, but not at the defendant, as the defendant by that time was out of sight. Defendant fired but once at the witness. After the shooting was over, the witness found on the platform the gun used by the defendant. This gun, the witness had understood, was the defendant's gun.

On his cross-examination, the witness testified that he had no recollection of making a threat against the defendant on that day, in the presence of Frank Brown. He made no threat against the defendant in the presence of any one. Witness went to the house of the Mexican, Hilario, but was not running the gambling game then in progress, nor did he have any interest in it. Witness had never been in the Mexican's house before. He was dealing the game of monte, and the defendant was betting at it at the time that the difficulty arose. Defendant had only a quarter wagered on the

game at the time he began the quarrel, but had made several previous bets. Witness was not drunk at the time of the quarrel at Hilario's. He sent Lathe Freeman out home for his pistol before he went to Hilario's house. He did not have the pistol in his hand at the time of the contention in the gambling house, but it was at that time in the Mexican's trunk. Witness did not hit the defendant in the face with the money, though he threw the money at him. He did not know that the money hit the defendant. Witness did not keep the defendant's hat, nor did he at any time have his hat. Defendant said nothing after the difficulty in the Mexican's house, but left, running at full speed, and the witness left a short time afterwards. Witness did not leave the Mexican's house with his hat in one hand and his pistol in the other, and say: "Hold on; I will bring you your hat." Witness followed the defendant to the second door, turned back, got his hat and the money, which the boys present had picked up, went to the bed, sat down for ten or twenty minutes, went back to the door, and asked where the defendant had gone to. Several of the "boys" replied, saying that he had gone to Jim Houghton's. Witness then went and got his pistol from Hilario, and was absolutely certain that he did not have that pistol in his hand when the quarrel occurred, nor did he have it when he ran the defendant out of Hilario's house. The witness's nephew Nathan Freeman brought the pistol to witness while witness was dealing the game of monte. When Freeman gave witness the pistol, witness did not throw it on the floor and say: "I winned this pistol and another pistol and $280 in the spring," nor did a Mexican woman pick the pistol up from the floor.

The witness testified that he sent for the pistol because he had been told that the defendant had said that he intended to kill any G—d d—d nigger misleading the colored voters into voting the democratic ticket, and that the defendant was misleading them to vote that ticket. No one asked witness for the defendant's hat, nor did the witness refuse to give it up. Witness was not told by any one present to go to bed — that he was drunk. Not more than twenty minutes elapsed from the time that witness left Hilario's house until the shooting occurred. The shooting took place some three or four hundred yards from Hilario's house, on the platform of the railroad in Manor. Witness fired three shots, and his pistol snapped once. The pistol snapped at witness's first attempt to fire, which was after the defendant had fired. Witness had done nothing whatever up to the time that the defendant fired. The defendant's weapon was an eight-shooting carbine. The defendant left so

suddenly after he fired the shot that the witness was unable to determine whether or not he had a hat on at that time. When the witness left Hilario's house, he went direct to the depot, going by Jerry Parsons's house, but finding no one at home. Witness inquired of no one, on his way from Hilario's to the depot, for the defendant. When witness asked the Mexican for the pistol, he told him that he was going to Jerry Parsons's to go to bed.

On re-examination, the witness said that the first persons he saw after he left the house of the Mexican, Hilario, were the defendant and the man who was with him behind the box car. He went first to Jerry Parsons's house, and, had he found anybody at home, would have remained there over night. The witness was not searching for the defendant when the shooting occurred, and had no idea of the proximity of the defendant, until he spoke from behind the car. Witness pulled his pistol and fired just as soon as he could, after the defendant shot him. He made no effort to shoot, resulting in his pistol snapping, before the defendant fired. No person other than witness, defendant and the man with defendant, whom the witness did not know, were present at the time that the shooting occurred.

Paul Wilson was the next witness for the State. He testified that he was in the town of Manor, in Travis county, Texas, on the night of November 4, 1884, and heard the shooting which resulted in the wounding of Al. Rainey. When the witness, in going across from Bittings's store to the depot, reached a point some twenty or thirty steps from the depot, his attention was attracted by some one calling out loudly, "G—d d—n you, I will kill you." Witness looked up and saw some one on the railroad platform with a gun in his hand extended towards some one else standing very near. The gun was fired a few seconds later. Several shots were fired shortly after the first shot. There were three men on the platform close together, two of them moving up the platform. The man at whom the shot was fired threw up his left hand, and squatted down. Some little time after this shooting the witness saw Al. Rainey lying on the platform, wounded. His clothes and his hand were bloody. Witness did not examine Rainey. It was possible that other parties than the three mentioned were on the platform at the time, as several moved off after the shooting occurred, but the three were the only parties within the range of the witness's sight at the time. He could not see the whole length of the platform. The witness's attention was no sooner attracted by the language quoted than he looked and saw the one man throw his gun down on the other, the

muzzle of the gun reaching nearly to the latter's face. That man, as soon as the gun was leveled, threw up his left hand and leaned forward. The gun then fired. The witness at that time could not see the right hand of the man at whom the shot was fired. The party who fired the shot, accompanied by the other man who was with him, ran instantly after the gun was discharged. Just after these two parties ran, the man at whom the first shot was fired, fired three shots at them. Witness saw no weapon in the hands of the man who was shot at, when the first shot was fired, nor did he see that man's right hand. The State closed.

Frank Brown was the first witness for the defense. He testified that he was in Manor on the 4th day of November, 1884, and was at the gambling house when the difficulty between the defendant and Al. Rainey occurred. The defendant was at the gambling house betting at monte before Al. Rainey came. When Rainey came he began dealing monte, and the defendant kept betting at the game. After a time the defendant won a quarter and demanded payment. Rainey refused to pay. Defendant insisted upon payment, when Rainey got mad and cursed the defendant. Defendant then got up and threw or dropped $2 out of his hand. Al. Rainey seized the money and struck the defendant in the face with it, and then seized the defendant and struck him in the face with his fists, and knocked his hat off. Rainey then caught up a bench and was in the act of striking the defendant on the head with it, when the witness interfered and prevented it. Al. Rainey then caught hold of the defendant and kicked him out of the room. Rainey got the defendant's hat. Defendant came back to the gallery and to the door of the room and asked for his hat. Al. Rainey refused to return the hat, but ran out of the house after the defendant, and the defendant went off.

Some little time after the defendant left, Rainey came out of the house and asked where the defendant had gone, and was told that the defendant had gone to Manor. He then went back into the gambling house, sat on the side of the bed for some twenty minutes or less, came out, and passed the witness, saying that he was going to Jerry Parsons's to go to bed. Rainey was then drinking. After he got over the fence the witness saw him take something from his pocket and examine it. Witness took that something to be a pistol, as it was bright and gleamed like the barrel of a pistol. Rainey then went on in the direction of Jerry Parsons's house, but before he reached that house he turned off and went on towards Manor, and in a very few minutes witness heard the shooting.

In the evening, while the voting was going on, Al. Rainey was talking to a voter when the defendant passed and said to the voter: "Come here; I want to show you a paper." The man went to the defendant, and just then Al. Rainey said to defendant: "Never mind; I will see you after the election closes." After the defendant left the Mexican's gambling house, Al. Rainey went back into it and stayed about twenty minutes, sitting on the bed. He then, as stated, left, passing by Jerry Parsons's house, in which there was no light, went on towards Manor, and soon the shooting occurred. Jim Houghton lives in another direction from the Mexican's gambling house.

Lee Edwards was the next witness for the defense. He testified that he was standing at the corner of the railroad platform and near the parties when the shooting occurred. The shooting occurred after good dusk. When Rainey came up to the platform witness asked: "Is that you Al.?" Rainey answered "Yes; who is that?" Witness replied: "I am Lee Edwards," and Rainey said "That's all right." The defendant at that time was standing a few feet distant from the witness on the platform. He asked: "Al., have you got my hat?" Rainey replied: "Is that you?" and the shooting commenced. Witness did not see the pistol in Rainey's hand, but as he asked "Is that you?" he bent forward with one hand raised, and the firing began. Rainey had a cigar in his mouth at the time. Witness could not tell who fired the first shot. The defendant ran after two shots were fired. Rainey followed after the defendant, shooting at him as he ran. Defendant turned back and tried to shoot again, but his gun would not fire. A crowd then gathered around, and when witness next saw the defendant he was in charge of Mr. Puckett, the constable. Witness stood within fifteen feet of the parties when the shooting occurred. Witness was of impression that Al. Rainey had been drinking.

On his cross-examination the witness stated that he lived on Walnut creek, four and a half miles from Manor. Witness related the facts to which he has here testified to Judge Smith, the attorney for the defendant. Witness told no one else but his own people, for the reason, he supposed, that no one else asked him. Witness heard people about the platform making general inquiries about the shooting, but he said nothing about it to any one. Witness did not run off with the defendant after the shooting. He met the defendant on the platform, and stood there a short time talking to him and one Lomax. Defendant had no hat on his head at the time of the shooting. He had either a carbine or a Winchester rifle in his hand.

Witness saw the defendant with a gun the day after the election. Al. Rainey leaned forward just before the shooting commenced. Witness went back to Bittings's store after the shooting was over. That store was about fifty yards from the point on the platform where the shooting occurred. He saw neither Wilson nor Ellison until after the shooting was over. The defendant was standing on the platform, bareheaded, with his gun in his hand, when Rainey walked up. Lomax, McCutcheon, Sam Lester and Robert Shackles were on the platform when Rainey arrived. Lester went away. Witness did not see Rainey do anything before the first shot was fired, except to lean forward and throw up his left hand. He did that just before the first shot was fired. Witness could not then see the position of his right hand. Al. Rainey had a cigar in his hand as he approached the platform.

L. Lomax was the next witness for the defense. He testified that he was at Manor on the night that the shooting between the defendant and Al. Rainey occurred. He heard the shooting but did not see the parties at the time it occurred. He heard part of what was said at the time. He heard defendant ask Rainey: "Where is my hat?" Rainey replied: "Is that you?" and the shooting began. Witness had passed around the corner just as Rainey came up and was asked by the defendant about his hat. He did not hear any one say "G—d d—n you, I will kill you."

Witness said, on cross-examination, that he was at the Mexican Hilario's dance or gambling house when the first disagreement between the defendant and Al. Rainey occurred on that night. Defendant was there, but had no gun there that the witness saw. When the defendant left Hilario's, he went down the fence towards Jim Houghton's house, which was not in the direction of Manor. Witness went on to Manor, and met the defendant on the railroad platform, as stated. Defendant then had a gun. Witness could not now tell how long he stayed at Hilario's sporting house after the defendant left,— possibly twenty minutes. Witness told nobody what he had here testified in regard to this matter, though he talked to Shackelford about it. Witness left Hilario's before Al. Rainey did. Rainey had nothing in his hand that the witness saw, when he first stepped upon the platform. Witness could not say how many shots were fired during the *melee.* He did not see the defendant run away from the platform after the shooting, nor did he see any one pursue him. Witness did not know how long the defendant had been on the platform with the gun, when he, the witness, arrived. The shooting occurred about a half or three quarters of an hour after the previous difficulty at the Mexican's sporting house.

Silas Simms was the next witness for the defense. He testified that he was at the sporting house of the Mexican Hilario, near Manor, on the night of November 4, 1884, when the first difficulty occurred between the defendant and Al. Rainey. The defendant was at that house betting at monte when Al. Rainey arrived. Rainey soon began to deal the game, and the defendant continued to bet. The table contest between the two seemed to progress upon friendly terms until the turn of a certain card which left defendant winner two bits. Defendant claimed the stakes on that turn, but Rainey refused to pay it. Defendant remarked, "Well, if that is the way you are going to play, I will quit," and as he made this remark he started to get up, and either threw or dropped $2 on the floor. Al. Rainey picked up the $2, threw them at the defendant, and struck him in the face with them. He then caught the defendant and kicked him, and drew a bench on him in a striking attitude. Frank Brown, however, interfered, and prevented Rainey from striking the defendant with the bench. Rainey then assaulted the defendant again, and kicked him out of the Mexican's house. He, Rainey, then returned to the room, picked up the money and defendant's hat, and got his pistol from the Mexican Hilario.

The defendant asked the witness to get his hat for him. Witness accordingly went to Rainey and asked him for the defendant's hat. Rainey replied: "I give up nothing." The defendant then came to the door of the room in which the difficulty occurred, and asked Rainey for his hat. Rainey, with his pistol in one hand and defendant's hat in the other, then ran the defendant off, the defendant disappearing around the corner of the house. Witness could not say which way the defendant went after he disappeared around the corner of the house. Rainey came back into Hilario's house, sat on the bed awhile, and then buckled on his pistol and left. The party was thereupon broken up. The defendant did not fight or make any resistance during the difficulty in Hilario's house. He did not return to the gambling room after Rainey drove him out. He did come back to the door and beg for his hat. He asked the witness to get his hat for him, but Al. would not give it to him. Witness was in the gambling room when Lathe Freeman brought Rainey his pistol. Rainey asked if the pistol was loaded. Lathe replied: "Yes, she is fresh loaded, all around." Rainey threw the pistol on the floor, and a Mexican woman picked it up, took it away, and put it in a trunk. The gambling house was then full. Defendant stayed about the premises for a little while after Rainey kicked him out of the gambling room, endeavoring to get his hat. When Rainey started at the defendant with the pistol, he called to the de-

fendant to hold up. Defendant left Hilario's place in a run. Rainey got his pistol from the Mexican just before he started after the defendant the last time. Witness saw no more of the defendant until after he was arrested. There was nothing to prevent Rainey from shooting the defendant when he ran him off around the corner of the house.

Cal. Jackson testified, for the defense, that he was at Hilario's sporting house near Manor when the first difficulty between Rainey and the defendant occurred. Rainey was dealing a game of monte at which the defendant was betting. Defendant claimed to have won a quarter of a dollar on one bet, which Rainey refused to pay. Defendant remarked: "If that is the way you are going to do, I will quit; you can keep your money." Defendant dropped $2 on the floor as he arose. Rainey took up the money and struck the defendant in the face with it. He then struck and kicked the defendant, and tried to strike him with a bench, but was prevented by Frank Brown. Rainey then kicked the defendant out of the room and came back and picked up the money and the defendant's hat. Defendant came back to the gambling room door and asked for his hat, but Rainey, instead of returning it, took after the defendant with his pistol and ran him off. Defendant did not again return to the gambling room. Rainey sat down on the side of a bed in the room, and after a time got up, buckling his pistol around his body. He left about ten minutes after the defendant did, and witness heard the shooting a few minutes afterwards. The Mexican Hilario got the defendant's hat.

Cross-examined, the witness testified that Rainey chased the defendant entirely around the corner of the house with the pistol. Witness could not see the defendant after he passed around the corner of the house. Witness did not know which way Rainey went when he left the house. Witness did not know what, if anything, prevented Rainey from shooting defendant when he chased him around the house. Rainey did not appear drunk. Witness heard some one tell Rainey that defendant had gone to Jim Houghton's.

James Puckett testified, for the defendant, that he was at Manor on the night of November 4, 1884, when Al. Rainey was shot by the defendant. Witness was then a deputy sheriff of Travis county. Witness was at the house where the judges of election were counting out the votes cast, when the shooting occurred. That house was situated about fifty yards from the platform on which the shooting occurred. Witness started to the platform as soon as he heard the shooting. As witness approached the platform, he saw some one

running towards him, who fell before he reached him. He got up again and continued his flight towards witness, leaning over, or inclining a little towards witness. That man stopped, drew his pistol on witness, and said: "Look out." Witness drew his pistol and ordered the man to lower his. He did so, and witness went up to him, wrung the pistol from his hand, and gave it to some person standing near by. Leaving this man, who proved to be the prosecuting witness Rainey, witness went on after the defendant. Witness did not find him then, but soon received him from the custody of other officers. He was then bare-headed.

Cross-examined, the witness stated that he looked about the depot for the defendant but could not find him. Witness did not examine Rainey's pistol at the time he got it from him, nor until after it had been in the hands of other persons. When the witness got it back it was empty. Rainey had just been wounded when the witness met him. He made no resistance after witness drew his pistol and ordered him to lower his.

Charley Watkins testified, for the defense, that he met Rainey as the latter was leaving the dance house of Hilario. The point of meeting was between Jerry Parsons's house and the depot. Rainey was alone. Rainey halted witness and asked if witness knew where the defendant was. Witness replied that he had not seen defendant. About five minutes later witness heard the shooting. Witness went on to Hilario's after passing Rainey, but did not stay there long. Rainey had nothing in his hand when the witness met him.

Alfred Rainey, the nephew of the prosecuting witness, testified for the defense that he saw his uncle kick, strike and run defendant away from the Mexican sporting house. He knew Rainey had a pistol at the Mexican's, but did not see him try to shoot the defendant.

Two witnesses testified for the State, in rebuttal, that when defendant left the Mexican's house, he said he was going to Houghton's house, and left going in that direction. When Rainey left he asked where defendant had gone. He was told that defendant had gone to Houghton's. He then left, going towards Manor,—a direction opposite from Houghton's.

Jack Arthur testified, for the State, in rebuttal, that just a few minutes before the shooting, defendant, bare-headed, and somewhat excited, ran hurriedly into Ernest Whitis's store, and got a Winchester he had left there that day. He said nothing but that he was going to take it to Mrs. Carrington's.

The eleventh paragraph of the charge of the court, which is the

subject-matter of the third head-note of this report, reads as follows: "The defendant would have no right to shoot Rainey to regain his hat, if taken before the meeting, nor because of any previous fracas at the gambling house, even if Rainey was in the wrong in such contest; and such matters could not excuse any subsequent acts, if any such are shown, of defendant at a different time and place."

The motion for new trial raised the questions discussed in the opinion.

*Sneed, Pendexter & Burleson,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

White, Presiding Judge. On the trial the defendant proposed to prove by the witness Puckett that he, the witness, was well acquainted with the general character of Rainey, the person alleged to have been assaulted, and that he was a turbulent, violent, overbearing, dangerous and desperate man. This evidence was objected to by the prosecution, because no predicate had been laid to admit evidence relating to the character of said injured party. This objection was sustained and the evidence excluded.

As to the admissibility in evidence of the character of the deceased on trials for homicide, and of the injured party in trials for assaults with intent to murder, there is much contrariety of decision. It was formerly held wholly inadmissible because the character was no part of the *res gestæ.* (*Regina* v. *Rowton,* 2 Leading Criminal Cases (Bennett & Heard), 333, and note, in which the cases are collated and the doctrine discussed.) This doctrine has been greatly modified, and, as now held in most of the States, it is admissible in cases where self-defense is claimed, and inadmissible where there is no such defense. (Whart. Crim. Ev., §§ 71 to 84 inclusive.)

Mr. Wharton says: "Taking the authorities as a whole, we may hold that it is admissible for the defendant, having first established that he was assailed by the deceased, and in apparent danger, to prove that the deceased was a person of ferocity, brutality, vindictiveness and of excessive strength; such evidence being offered for the purpose of showing, first, that the defendant was acting in terror, and hence incapable of that specific malice necessary to constitute murder in the first degree; or, secondly, that he was in such apparent extremity as to make out a case of self-defense; or, thirdly, that the deceased's purpose in encountering the defendant was

deadly. Of course it is admissible for the defendant, in order to excuse a violent repulsion of an assault, to prove that he was so over-matched in strength that he had, when attacked, no other means of escaping from death or great bodily harm. But such evidence can never be received for the purpose of justifying an attack by the defendant on the deceased." (Whart. Crim. Evid., § 84.)

In Texas the rule is that "threats made by the deceased and the dangerous character of deceased are only admissible when it is shown that, at the time of the homicide, the deceased did some act indicating his purpose then to take the life of the defendant, or do him some serious bodily harm; or when the circumstances of the case raise a doubt in regard to the question whether the accused committed the homicide in self-defense." (*Creswell* v. *The State*, 14 Texas Ct. App., 1.) In *Moore* v. *The State*, 15 Texas Ct. App., 1, it is said: "In trials for homicide where the evidence presents the issue of self-defense, the general character of the deceased may be proved by the defendant to show that he, the defendant, was justified in believing himself in danger of losing his life or of sustaining serious bodily injury from the deceased." (Citing *Horbach* v. *The State*, 43 Texas, 242; *Stevens* v. *The State*, 1 Texas Ct. App., 591. See, also, *Hudson* v. *The State*, 6 Texas Ct. App., 565.)

To apply these rules of law, it appears that the defendant and Rainey, the prosecutor, had had some misunderstanding in the early part of the day, when Rainey told him he would see him after the election was over. At night the parties again met at the Mexican's house, where they engaged in a game of cards, the game being dealt by the prosecutor; which resulted in the prosecutor's assaulting the defendant, and kicking him, and picking up defendant's hat and money, which he had dropped, and retaining them; and when the appellant afterwards came to the door and asked Rainey for his hat, the latter rushed at him with pistol in hand, and ran him off the premises. Shortly afterwards Rainey, the prosecutor, girded his pistol on, ostensibly to go to a friend's house to stay all night, but he is soon seen at the depot platform, where appellant was standing with another party. After a few words had passed between him and the other party, appellant, who had a gun or carbine in his hand, said: "Al., have you got my hat?" Rainey said, "Is that you?" And as he said so he bent forward, with his left hand raised just above him, and the witnesses all say that just then the shooting commenced. Two shots were fired, and Edwards, who was standing closest to the parties, says he could not tell who shot first. After

appellant fired his one shot he ran, and Rainey fired several shots after him.

We think the acts of Rainey at the time of the difficulty, taken in connection with his previous acts and conduct towards appellant, entitled the latter to show by the witness Puckett the general reputation of Rainey as to his being an overbearing, desperate and dangerous man. (*State* v. *Graham*, 61 Iowa, 608.)

And in connection with this testimony, we are also of opinion that appellant would have the right to have the jury instructed as was asked in his special requested instruction, which was refused: "If the jury believe from the evidence in this case that, at the time George West, defendant, shot Al. Rainey, the defendant believed, and was justified in believing, from the conduct and acts of Al. Rainey at the time he shot him, that it was necessary to shoot Rainey to save his own life, or to protect himself from great bodily injury, the jury will return a verdict of not guilty." Whilst the general charge of the court upon this phase of the case was correct as far as it went, it did not present the law to the extent and as pertinently in behalf of defendant as he was entitled to, and as it was presented in the requested special instructions.

We are also of the opinion that the eleventh paragraph of the charge was calculated to be misconceived by, if it did not mislead, the jury into the belief that they were not to consider at all any of the acts or any portion of the conduct of Rainey, at the previous difficulty between the parties, in connection with his acts and conduct at the time and place of the shooting.

For error of the court in excluding the proposed evidence of the witness Puckett, as shown in the bill of exceptions, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered June 26, 1885.]